## Case No. 17,688.

### The WILLIAM CAREY.

[Affirming The William Carey, Case No. 17,-689. Nowhere reported; opinion not now accessible.]

===

## Case No. 17,689.

### The WILLIAM CAREY.

[3 Ware, 313.] [1]

District Court, D. Maine. Feb., 1865.[2]

SALE OF VESSEL BY MASTER—VALIDITY.

To render a sale valid, made by a master of a vessel under the general authority vested in him, and convey a good title under it, there must be a necessity for such sale, and entire good faith on the part of the master.

Shepley & Dana, for libellant.
Mr. Hale and S. C. Strout, for claimant.

WARE, District Judge. The William Carey, a British barque of about 580 tons burthen, Edward Williams, master, sailed from London in May, 1863, for New Zealand, with a general cargo, and passengers with their freight, and having delivered her cargo there, went to the Chincha islands and took in a cargo of guano, which she delivered at Martinique in the West Indies. She then went to St. Thomas, and was there chartered by her master to go to St. John, New Brunswick, for a cargo of deal, which she was to deliver at Liverpool, England. She took in 300 tons of ballast, and sailed from St. Thomas Oct. 2d, 1864, and on the coast of Maine she first made the island of Mount Desert Nov. 4th, at 6 o'clock in the morning, about fifteen miles distant, with a strong wind, increasing to a gale from the S.S.E., driving directly towards the island. She came to anchor near the Duck islands, in about 19 fathoms water, and she let out 75 fathoms of chain. In about twenty minutes the port barrel of her windlass gave way under the strain of the wind, the cranks crooked, the wood-work broke, and it was entirely useless. After that broke she was made fast to the deck stoppers. She held for fifteen minutes, and then the cable parted at the 15th fathom shackle from the anchor. She then drifted towards Gott's island, and when she was half way from Gott's island to Bass Harbor Light, let go her starboard anchor and 55 fathoms of chain, which held her through the night. The next day, Sunday, the master went ashore for aid, and to get the windlass repaired. He got six or seven men, who succeeded in heaving the cable and fixed the windlass, but it could not be used. The master then left with the mate, to obtain a pilot to bring the vessel into harbor. He succeeded in obtaining a pilot, but such was the state of the wind and weather that he could not get on board the vessel till the 10th. He then shipped the cable, and with Moor, the

pilot, and Capt. Benson, steered into the harbor and anchored in four fathoms water, with a spare anchor of about 1200 lbs. The wind then blew a gale from the S.W. They let out fifty fathoms of cable, but the vessel drifted directly on shore on a ledge of rocks at full high water. She rested on the rocks at both ends and made water freely, as there was as much, or nearly so, inside as outside. The master got assistance the next tide, and endeavored to get her off in vain. He then went ashore to note his protest with a notary, and saw the wreck-master, Capt. Benson. The notary ordered a survey. Three surveyors were appointed, two masters of vessels, and one ship-carpenter. They reported after a careful examination, that she could not be got off the rocks, and recommended that she be sold the next day, at 4 o'clock p. m., where she lay. She was accordingly sold, and under this sale the claimants claim to hold the vessel. The counsel of his Britannic majesty acting officially for the benefit of the original owners, or whoever may claim title under them, disputes this title, and the captain's right to sell is the question now to be decided.

The legal authority of the master to sell a vessel under his care, as master, is too well settled in both English and American jurisprudence, to be controverted, and it has not been in this case. But to render a sale valid, and convey a good title under it, two circumstances must concur. There must be a necessity for a sale, and there must be entire good faith on the part of the master. In this case the necessity arises from the vessel being driven on the rocks in that harbor. It was a rocky shore where she struck, and to a considerable distance each way, and if she drove at the mercy of the winds she could not by any possibility avoid them. It is proved, also, that other vessels had been wrecked on, or near where this went on the rocks, and that none had been saved. The master, after making an unsuccessful attempt to get her afloat from the rocks the next tide, went ashore to note his protest, and get aid and advice. The notary advised a survey, and appointed three persons to make it, as competent and judicious as could be found in that place, two of which had been masters of vessels, and one a ship-carpenter. They went on board, and after a careful examination, reported that she was much damaged, bilged badly, hogged, strained, nearly full of water, and could not be removed from her present position. The surveyors lived in the neighborhood, were men well acquainted with the character of the shore where she lay, knew all the facilities, as well as difficulties of saving vessels in that place, as well as the hazards of the weather at that season of the year, and were men of as much experience, knowledge, and character, as any in the place. They examined the condition of the vessel, and gave their opinion under a feeling of responsibility, and to their conclusion much deference would naturally be shown. And their judgment agreed

---

[1] [Reported by George F. Emery, Esq.]
[2] [Affirmed by circuit court; case unreported.]

with that of the master. Under all the circumstances, they recommended the sale of the vessel where she lay, the next day, Saturday, at four o'clock p. m., and the master's opinion concurred with them. After the survey on Saturday morning, the United States steamer Mahoning went into Bass Harbor, and the captain, with the chief engineer, Mr. Douglass, made a short visit to her. It is the duty of this vessel to aid others in distress. She is prepared for it, and it is the opinion of the chief engineer, that if the weather favored her, she could, with proper appliances, have been saved. But this was after the survey, the order of sale, and the advertisement, when the business was in the hands of the law, and the master chose to be influenced by that decision, by the opinions of discreet men before expressed concurring with his own, than in any uncertain opinion subsequently volunteered by others, and she was sold accordingly for $1,000 in gold, or the equivalent, $2,500 in currency. If any arguments may be drawn from subsequent facts, it may be observed that no attempt was made to get her off the rocks, but she was stripped where she lay at the time.

The necessity of a sale is. I think, made out by the evidence. But this is not alone sufficient. There must be entire good faith in the sale on the part of the master. He is appointed to navigate the vessel, and for that purpose he is the agent of the owners, and has all the powers that such an agency requires; but the agency to sell, the law rather casts on him in extreme cases, and it is his duty to obtain as much for her, and for the benefit of his owners, as he can. The judgment or good faith of the master is questioned in this,—that sufficient time was not allowed to circulate the information more widely. The survey was made Friday, and the sale was ordered on Saturday, on the recommendation of the surveyors. Immediate notice was given of the sale by posting up advertisements in the three principal settlements of that town. But it is said that sufficient time was not given to spread the notices, and the population of Tremont was small. Still there were enough men of property in the place to create some competition, though perhaps not so great as would arise from a more extensive notoriety. At the same time the situation of the vessel was full of peril. She lay on the rocks, where she was driven from her mooring by the violence of the wind, and a heavy storm which was then threatening might make her completely a wreck. In these circumstances the master followed the opinions of the surveyors, and ordered a sale at that time.

Another circumstance is relied on in impeaching the master's good faith, that he did not order her to be sold in lots, but in the lump. On this point there is a difference of opinion among the witnesses, some thinking that she could sell better one way and some in the other. The master chose to sell her in the lump. There is room for this difference of opinion, and it would be a hard measure to attribute the determination of a doubtful matter to the want of integrity in the master.

But the heaviest charge against the good faith of the master is in the concealment of the time of sale from the officers of the Mahoning. They visited the vessel on the morning of the sale, after the time was fixed, and it was the duty of the master to give all the publicity to it that was possible. Yet he not only did not mention it, but took pains to conceal it, by pretending that the time was not determined, and assuring them that they should be informed. This fact, of which there could be no doubt, is left entirely unexplained by the testimony. I cannot explain it to my satisfaction. But on this fact alone, it would be a harsh judgment to blast the master's reputation perpetually.

A good deal has been said at the argument, of a general conspiracy at the sale to injure the owners or under-writers. Such rumors would naturally be set afloat, but as they are not supported by any evidence in the case, they may justly be dismissed, more especially as the case is subject to appeal, in which new evidence and any error may be corrected.

Libel dismissed with costs.

[On appeal to the circuit court, the above decree was affirmed. Case unreported.]